RANDY E. KLEINMAN (CA SBN 320061)
GERSTMAN SCHWARTZ LLP
1399 Franklin Avenue, Suite 200
Garden City, New York 11530
Telephone:    (516)880-8170
Facsimile:    (516) 880-8171
Email:        rkleinman@gerstmanschwartz.com

Attorneys for Plaintiff
ALI AL-AHMED

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ALI AL-AHMED,<br><br>        Plaintiff,<br><br>    v.<br><br>TWITTER, INC.,<br>ALI HAMAD A ALZABARAH, and<br>AHMAD ABOUAMMO,<br><br>        Defendants. | ) CASE NO.:<br>)<br>) **COMPLAINT AND DEMAND**<br>) **FOR JURY TRIAL**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

1

2      For his complaint, Plaintiff Ali Al-Ahmed ("Mr. Ahmed"), by and through its attorneys

3   Gerstman Schwartz LLP, avers as follows:

4                                          **THE PARTIES**

5      1.      Plaintiff Ali Al-Ahmed (hereinafter "Plaintiff" or "Mr. Al-Ahmed") is one of the

6   leading critics to the Kingdom of Saudi Arabia (hereinafter "KSA") who resides, and has been

7   granted asylum in, the United States, because as a political dissident and human rights

8   advocate, he faced imminent persecution were he to return to his native country, Saudi Arabia.

9      2.      Defendant Twitter, Inc., (hereinafter "Twitter") is incorporated in Delaware with

10   its headquarters in San Francisco, California.[1]

11      3.      In 2011, Saudi Prince Alwaleed Bin Talal (hereinafter "Bin Talal") purchased $300

12   million worth of stock in Twitter.  In 2015, Bin Talal made an additional investment, owning

13   5.2% of the company, more than Twitter's founder and CEO[2]. A January 29, 2018 article in

14   the British newspaper, *The Daily Mail*, reported that after being imprisoned and perhaps

15   tortured by KSA, Bin Talal signed over many of his assets to Crown Prince Mohammed Bin

16   Salman (hereinafter "MBS").  According to *The Daily Mail*, a deal was allegedly made with

17   MBS allowing MBS to seize control of these assets and those of other princes, so long as the

18   assets remained in the United States.

---

[1] The term "Twitter" shall hereinafter refer to Twitter, Inc., its agents, employees, and assigns.
[2] Twitter's April 20, 2016 Annual Proxy Statement, on page 56, confirms that HRH Prince Alwaleed Bin Talel Abudulziz Alsaud beneficially owned 4.99% of the company. A second amendment to a 13G filed with the Securities Exchange Commission on or about December 31, 2016 states that "based...on the [third quarter 10Q] percentage of class was reduced to 4.9%." This auspicious reduction permitted the Kingdom to avoid future filing and disclosure requirements. A BBC report dated October of 2015 noted that "Prince Alwaleed bin Talal and his investment firm now owns just over 5%, which is more than Twitter's new chief executive Jack Dorsey. His cash injection comes at a critical time for Twitter, which is struggling to attract new followers. Saudi Arabia is said to be home to 40% of all active Twitter users in the Middle East." http://www.bbc.co.uk/newsbeat/article/34474798/meet-twitters-second-biggest-shareholder-saudi-prince-alwaleed-bin-talal.

COMPLAINT AND DEMAND FOR JURY TRIAL
CASE NO.____

4.      Based on news reports indicating that 40% of all active Twitter users in the Middle East reside in the Kingdom, and this highly influential stake made in Twitter by a Saudi prince, Twitter's hiring of Saudi Nationals, who turned out to be Saudi agents, and its abject failure to properly safeguard Plaintiff's account takes on a new light. Plaintiff's personal and highly sensitive information, including confidential information provided by his followers and journalistic sources, was disclosed to third parties including, but not limited to, the KSA and its agents as a result of Defendants' recklessness, negligence, and, at times, intentional acts or omissions that appear to have been designed to appease a critical investor, MBS.

5.      Defendant Ahmad Abouammo (hereinafter "Abouammo") is a dual citizen of the United States and Lebanon and resided in Walnut Creek, California, in the Northern District of California, from at least November 4, 2013, until May 22, 2015, and thereafter resided in Seattle, Washington. Abouammo was an employee of Twitter from on or about November 4, 2013, to on or about May 22, 2015. Abouammo was a Media Partnerships Manager responsible for the Middle East and North Africa (MENA) region at Twitter. As a Media Partnerships Manager, Abouammo was involved in providing assistance for notable accounts, including accounts of public interest or belonging to brands, journalists, and celebrities in the MENA region, with content and Twitter strategy, and with sharing best practices.

6.      Defendant Ali Hamad A Alzabarah (hereinafter "Alzabarah") is a citizen of Saudi Arabia and resided in San Bruno, California in the Northern District of California from at least August 12, 2013, until December 3, 2015. Alzabarah was an employee of Twitter from on or about August 12, 2013, to on or about December 4, 2015. While employed at Twitter, Alzabarah was a Site Reliability Engineer whose responsibility was maintaining Twitter's hardware and software to ensure uninterrupted service.

7.      On November 19, 2019, Abouammo and Alzabarah were indicted for acting as agents for the government of Saudi Arabia who, while employed at Twitter, accessed user information without authorization and provided it to Saudi Arabian government officials.[3] Abouammo and Alzabarah gained access to dissidents and critics of the Saudi government including, upon information and belief, Mr. Al-Ahmed.

8.      Defendants Twitter, Abouammo, and Alzabarah shall hereinafter be referred to collectively as "Defendants."

## **VENUE AND JURISDICTION**

9.      Jurisdiction is proper in this Court because this litigation arises under federal law, namely 18 U.S.C. §2701 et seq. ("Stored Communications Act"). Jurisdiction is also proper because this Court has diversity jurisdiction over this action and each Defendant under 28 U.S.C. § 1331.

10.     The Court has supplemental jurisdiction over the state law claims asserted in this case under 28 U.S.C. § 1367 and 28 U.S.C. § 1362 because there is diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

11.     Venue is proper in this district under 28 U.S.C. §§ 1391(b) and 1391(c).

12.     This Court has personal jurisdiction over Twitter because Twitter, on information and belief, conducts business in the State of California and within this district.

13.     This Court has personal jurisdiction over Abouammo and Alzabarah because they resided, and were present in, the State of California and within this district when the acts alleged occurred.

---

[3] https://www.justice.gov/usao-ndca/united-states-v-ahmad-abouammo.

COMPLAINT AND DEMAND FOR JURY TRIAL
CASE NO.___

## GENERAL ALLEGATIONS

*"Twitter being abused to instill fear, to silence your voice,*
*or to undermine individual safety, is unacceptable."*
-- @TwitterSafety, October 3, 2020[4]

14.     Defendants have engaged in outrageous, irresponsible, and despicable conduct that should be punished to the maximum extent under the law.

15.     This is an action to vindicate the rights of Mr. Al-Ahmed, a political refugee who has been granted political asylum in the United States from the despotic regime in the KSA. Because of the tremendous wealth of key figures in KSA, major corporations, including Twitter, have enabled, collaborated, colluded,  conspired with, aided and abetted, and/or otherwise turned a blind eye to KSA's efforts to suppress, torture, falsely imprison, terrorize, and murder dissenters both within Saudi Arabia and around the world.

### A.  Allegations Relevant To All Causes Of Action

16.     Mr. Al-Ahmed is a leading voice of dissent casting an evidently unwanted magnifying glass upon the acts and omissions, policies and, at times, alleged crimes conducted on behalf of, or with the knowledge and consent of, the KSA or elements within the KSA. Mr. Al-Ahmed is also one of the most active and courageous journalists within the United States covering the KSA. Through his prominent social media presence, and persistent critique of the KSA, Mr. Al-Ahmed has brought broad awareness to issues of social and political concern including allegations of KSA human rights violations, KSA links to international terrorism, and KSA corruption within the Kingdom.

17.     It is not an overstatement to suggest that Mr. Al-Ahmed has become a thorn in the side of the KSA. Indeed, he would not dispute that he has made it his life's work to counter KSA propaganda and expose systemic corruption, violence, and police state tactics within the KSA, and to counter the KSA's efforts to masquerade itself as a modern nation. As a

---

[4] Twitter Safety (@TwitterSafety), Twitter (Oct. 3, 2020),
https://twitter.com/TwitterSafety/status/1312498519094091779 (on file with the *Columbia Law Review*) (emphasis added).

COMPLAINT AND DEMAND FOR JURY TRIAL
CASE NO.____

result, Mr. Al-Ahmed attests that the KSA has consistently attempted to—quite literally—silence his voice, even going so far as to attempt to kidnap and kill him on multiple occasions. The KSA has also formally stripped Mr. Al-Ahmed of his Saudi nationality and has kept him under vigilant surveillance.

18.     He has been invited to speak by institutions including Princeton University, Amnesty International, the Hudson Institute, American Enterprise Institute, and Meridian International Center, and has testified before Congress on several occasions on the issue of civil rights and religious freedom in the Middle East. Additionally, he has authored reports on Saudi Arabia regarding religious freedom, torture, press freedom, and religious curriculum.

19.     Although Mr. Al-Ahmed usually disseminates information via social media, Al-Ahmed is a frequent consultant to major international broadcast media outlets on issues including Saudi political affairs, terrorism, Sunni-Shi'a relations, Wahhabi Islam, political and religious oppression, human and women's rights in Saudi Arabia, and the Saudi-U.S. relationship. He has been a regular guest on CBS News, CNN, PBS, Fox News, and Al-Jazeera. He has written for, and has been quoted in, the Washington Post, Associated Press, The Times, Reuters, the Wall Street Journal, USA Today, and the Boston Globe. In short, he is a leading Saudi voice for KSA reform and democratization.

20.     With the passage of time, Mr. Al-Ahmed has become such an influential voice that multiple prominent Saudi officials have followed his Arabic Twitter, his largest verifiable social media account, which has over 36,000 followers worldwide (although, as will be described in further detail herein, it has since been suspended).

**B. Twitter's Unauthorized and Unlawful Hacking of Mr. Al-Ahmed's Private Information**

21.     In or around August 2013, until in or around December 2015, Alzabarah and Abouammo– Twitter employees charged and indicted by the United States government in

COMPLAINT AND DEMAND FOR JURY TRIAL
CASE NO.____

November 2019 for being KSA spies[5] – accessed the company's information on an array of Saudi dissidents including Mr. Al-Ahmed[6].

22.     Through use of both Alzabarah and Abouammo, the KSA was successful in using Twitter's internal resources to identify Mr. Al-Ahmed as a critic of the government and ultimately silence him.

23.     On numerous occasions, Alzabarah and Abouammo mined Twitter's internal systems for, *inter alia*, personal information regarding Mr. Al-Ahmed, email addresses, contacts, phone numbers, birth dates, and internet protocol ("IP") addresses.

24.     Although Alzabarah and Abouammo's conduct was ostensibly outside the scope of their job duties, Twitter surreptitiously aided and abetted Alzabarah and Abouammo by, among other things, 1) providing them with unfettered access to Twitter's vast resources and infrastructure at the behest of the KSA and with the full knowledge that they would exploit these privileges by improperly gaining access to the accounts of Twitter users, such as Mr. Al-Ahmed, who were adverse to the Saudi regime; 2) helping Alzabarah and Abouammo operate their clandestine operation undetected until they were no longer of use to Twitter and/or the KSA; 3) helping Alzabarah and Abouammo provide the ill-gained information to the KSA; 4) and covering up their malfeasance by purging its internal database of any incriminating evidence and thereafter publicly renouncing Alzabarah and Abouammo's conduct.

25.     A superseding indictment filed by the United States Attorneys' Office makes clear that Twitter failed to detect these breaches over a period of time spanning over a year[7]. While

---

[5] https://www.justice.gov/usao-ndca/press-release/file/1215976/download, *United States v. Ahmed Almutairi*, a/k/a Ahmed Aljbreen; and Ali Alzabarah, November 2019.

[6] Superseding Indictment, July 28, 2020, 19-CR-621 EMC, "After ALZABARAH returned to San Francisco, from May 21, 2015, through November 18, 2015, he accessed without authorization through Twitter's computer system certain nonpublic account information of dozens of Twitter users, including accounts that had posted critical or embarrassing information about the government of KSA and Saudi Royal Family Member-1."

[7] *See id.*

COMPLAINT AND DEMAND FOR JURY TRIAL

CASE NO.____

Twitter has since ostensibly attempted to remedy their indefensible security practices, the damage to Mr. Al-Ahmed and his followers had already been done. Twitters' subsequent efforts to enhance their security protocols does not undo the damage done to Mr. Al-Ahmed and his followers as a result of Twitter's slip shot practices which have made Mr. Al-Ahmed, and many of his followers, targets for the brutal KSA, jeopardizing the very lives of his followers living within the confines of the KSA and its surrounding environs.

26.     Indeed, several Twitter users, who either followed Mr. Al-Ahmed's Twitter account and/or had direct contact with him through the use of Twitter's private messaging feature, have disappeared, been arrested, or have been executed. One such example is Abdullah al-Hamid, a Saudi Dissident and follower of Mr. Al-Ahmed's Twitter account, who was jailed and ultimately died in custody[8].

27.     On the heels of all this death and skullduggery, in or about May 2018, the KSA managed to fully silence Mr. Al-Ahmed when they had their embedded Twitter agents, or others within Twitter, suspend Mr. Al-Ahmed's Arabic Twitter account, "@AliAlahmed," without explanation, warning, or justification. Despite the above-noted Justice Department criminal complaint exposing these Twitter KSA agents' activities in November of 2019, Mr. Al-Ahmed's repeated attempts to appeal his suspension have been to no avail. While Twitter may wish to play the victim of state-sponsored espionage, Twitter's conduct in punishing the victims of this intrigue, including Mr. Al-Ahmed, tells a far different story: one of ratification,

---

[8] https://www.nytimes.com/2020/05/21/world/middleeast/abdullah-al-hamid-saudi-dissident-dies-in-detention-at-69.html.

COMPLAINT AND DEMAND FOR JURY TRIAL
CASE NO.___

complicity, and/or adoption tailored to appease a neigh beneficial owner and preserve access to a key market, the KSA[9].

28.     This helps explain why Twitter has upheld Mr. Al-Ahmed's suspension and kept his account inaccessible including Mr. Al-Ahmed's access to his approximately *36,000 followers' contact information*. The genesis of this suspension having been clearly exposed, Twitter continues to bar Mr. Al-Ahmed from access or use, corroborating his claims that Twitter is continuing to do the KSA's bidding;  preferring access to the KSA and funding from the KSA over human rights, freedom, and to abiding by the terms of its owner agreements made with Twitter subscribers, and in contravention of its public representation that Twitter is committed to protecting Twitter uses.

29.     Twitter's Privacy Policy states, in pertinent part, that:

> About public and protected Tweets – Should you choose to protect your Tweets, you can do so through your account settings…If you protect your Tweets, you'll receive a request when new people want to follow you, which you can approve or deny…Protected Tweets: Only visible to your Twitter followers. Please keep in mind, your followers may still capture images of your Tweets and share them."[10]

---

[9] Authorities have evidently failed to recognize how beholden Twitter is to the KSA, particularly during the timeframe in question, which supports an allegation of willful blindness and complicity. Additionally, by punishing the victim of this conduct, *i.e.*, by continuing to withhold the above-referenced followers' contacts of a known critic of the KSA, Twitter has ratified the actions of its supposedly errant employees and shown its continuing allegiance to the KSA. *C.R. v Tenet Healthcare Corp.*, informs us that "an employer may be liable for the employer either authorized the tortious act or subsequently ratified an originally unauthorized tort."169 Cal. App. 4th 1094, 1110 (2009) (citations omitted). Discovery will likely establish that Twitter knew about, and was complicit in, this espionage. At the very least, Twitter's course of conduct since—notwithstanding its assertions of federal cooperation—amounts to ratification because Twitter continues to punish the KSA's enemies by withholding their followers' contact information and banning them from the platform.

[10] https://help.Twitter.com/en/safety-and-security/public-and-protected-tweets, "About public and protected Tweets – Should you choose to protect your Tweets, you can do so through your account settings…If you protect your Tweets, you'll receive a request when new people want to follow you, which you can approve or deny…Protected Tweets: Only visible to your Twitter followers. Please keep in mind, your followers may still capture images of your Tweets and share them."

COMPLAINT AND DEMAND FOR JURY TRIAL

CASE NO.____

30.     Twitter thus created an illusion of security and safety relied upon by Plaintiff, and, according to Plaintiff, by those who were disappeared, arrested, or murdered.

31.     Mr. Al-Ahmed spent many years of time and effort cultivating and curating his expansive list of Twitter followers and business contacts, which effectively amounts to valuable intellectual and proprietary property—particularly insofar as it has earned him credibility, career nods, and, significantly, income—reflecting a huge number of persons interested in unvarnished coverage of the KSA's activities provided from a pro-democracy and pro-human rights vantage point.[11]   Upon information and belief, some of Mr. Al-Ahmed's followers' accounts have also been shut down as a result of protesting his account suspension. This is not only immoral, but also undemocratic.

32.     In pertinent part, Twitter, in its "Twitter Rules," states that:

> Twitter's purpose is to serve the public conversation. Violence, harassment and other similar types of behavior discourage people from expressing themselves, and ultimately diminish the value of global public conversation. Our rules are to ensure all people can participate in the public conversation freely and safely…Safety - Violence: You may not threaten violence against an individual or a group of people. We also prohibit the glorification of violence. Learn more about our violent threat and glorification of violence policies…
>
> Terrorism/violent extremism: You may not threaten or promote terrorism or violent extremism. There is no place on Twitter for terrorist organizations or violent extremist groups and individuals who affiliate with and promote their illicit activities. The violence that these groups engage in and/or promote jeopardizes the physical safety and well-being of those targeted. Our assessments in this context are informed by national and international terrorism designations. We also assess organizations under our violent extremist group criteria. Violent extremist groups are those that meet all of the below criteria: identify through their stated purpose, publications, or actions as an extremist group; have engaged in, or currently engage in, violence and/or the promotion of violence as a

---

[11] Indeed, the United States Attorneys Office's Indictment defines nonpublic information about Twitter users as "valuable property." https://www.justice.gov/usao-ndca/page/file/1299331/download

COMPLAINT AND DEMAND FOR JURY TRIAL
CASE NO.____

means to further their cause; and target civilians in their acts and/or promotion of violence. We examine a group's activities both on and off Twitter to determine whether they engage in and/or promote violence against civilians to advance a political, religious and/or social cause.

What is in violation of this policy? Under this policy, you can't affiliate with and promote the illicit activities of a terrorist organization or violent extremist group. Examples of the types of content that violate this policy include, but are not limited to: engaging in or promoting acts on behalf of a terrorist organization or violent extremist group; recruiting for a terrorist organization or violent extremist group; providing or distributing services (e.g., financial, media/propaganda) to further a terrorist organization's or violent extremist group's stated goals; and using the insignia or symbols of terrorist organizations or violent extremist groups to promote them. What is not a violation of this policy? We may make limited exceptions for groups that have reformed or are currently engaging in a peaceful resolution process, as well as groups with representatives who have been elected to public office through democratic elections. We may also make exceptions related to the discussion of terrorism or extremism for clearly educational or documentary purposes. This policy also doesn't apply to military or government entities[12].

33.   Between Twitter's holding out that one can protect their Tweets, the above-referenced affirmative corporate and global commitment to "serve the public conversation," and Twitter's supposed opposition to violence and terrorism, Twitter's failure to screen and supervise its employees, thereby allowing KSA spies to locate KSA critics and disseminate their information so that they could be silenced, makes a mockery of this so-called "commitment." It is unfortunate that individuals like the Plaintiff have detrimentally relied on Twitter's purported commitment to their undying personal prejudice, particularly in the face of those who how have been disappeared, arrested, or otherwise subject to KSA extreme

---

[12] https://help.twitter.com/en/rules-and-policies/twitter-rules

COMPLAINT AND DEMAND FOR JURY TRIAL
CASE NO.___

prejudice or sanction—perhaps for having followed Plaintiff or "liking" one of his posts, while believing that their identity was "protected."

34.    Now, Plaintiff cannot even access his list of over 36,000 pro-democracy leaning followers who have had enough of the KSA's police state antics, perversely turning Twitter's "commitment" on its head by silencing critics of terrorism and violence, and positioning Twitter to carry out the KSA's mission by doing violence to truth and free speech, and by denying Plaintiff access to his proprietary list of followers, contacts, research, and other intellectual property, even after Twitter's slip shod adherence to its protocols, and negligence in its hiring and supervising of embedded spies was roundly exposed by the Department of Justice's November 2019 Criminal Complaint[13].

35.    Despite its alleged commitment to "serve the public conversation", Twitter's conduct is equivalent to Poland's silencing of Lech Wałęsa to preserve its reach, market share, and funding from the USSR. To make matters worse, Twitter did so *after* hiring KSA agents and recruits to oversee internal operations.  The ramifications of this kind of continuous and willful blindness cannot be overstated.

36.    In Twitter's 2020 10Q filed with the Securities and Exchange Commission, Twitter "disclosed that on July 28, 2020, the Company received a draft complaint from the Federal Trade Commission (FTC) alleging violations…[r]elate[d] to the Company's use of phone number and/or email address data provided for safety and security purposes [ostensibly for targeted advertising] during periods between 2013 and 2019 [and reserving for]…probable loss in this matter is $150.0 million to $250.0 million."[14] Twitter has clearly failed to safeguard

---

[13] https://www.justice.gov/usao-ndca/press-release/file/1215976/download
[14] 10Q dated June 30, 2020,
https://www.sec.gov/ix?doc=/Archives/edgar/data/1418091/000141809120000158/twtr-20200630.htm

COMPLAINT AND DEMAND FOR JURY TRIAL
CASE NO.____

data as it promised and as its users, such as Mr. Al-Ahmed, would expect. Therefore, Twitter must be held accountable.

### C. Jack Dorsey's Relationship With The Twitter Spy Ring

37.     Further demonstrating Twitter's complicity in the Twitter spy campaign is Twitter CEO, Jack Dorsey's ("Dorsey") relationship to Bader al-Asaker ("Asaker"), head of MBS' affairs and operator of the Misk Foundation, who has also been dubbed the "Saudi mastermind" behind the Twitter spy scandal.[15]

38.     The Twitter scandal, together with Asaker's reported links to the murder of Saudi journalist Jamal Khashoggi, raises tough questions about Asaker and the KSA. "Scratch beneath the surface of Asaker's Misk and you quickly realize that it's not really what it claims to be," Sunjeev Bery, director of the United States-based anti-autocrat campaign group Freedom Forward, told *The New Arab*.[16] "The crown prince and his henchmen keep trying to present themselves in a positive light, yet behind the scenes they spy on dissidents' Twitter accounts and are willing to take a bone saw to anyone who disagrees with them."[17]

39.     The United States Attorneys Offices' superseding indictment (the "Indictment") against Abouammo and Alzabarah substantiates Asaker's participation in the spy ring, referring to him (upon information and belief) as "Foreign Official-1," whom provided Abouammo and Alzabarah with "gifts, cash payments, and promises of future employment in exchange for nonpublic information about Twitter uses, which constituted valuable property…"[18]

---

[15] https://english.alaraby.co.uk/analysis/meet-saudi-mastermind-behind-twitter-spy-scandal
[16] *Id.*
[17] *Id.*
[18] https://www.justice.gov/usao-ndca/page/file/1299331/download

40.     According to the Indictment, Abouammo and Alzabarah were also responsible for removing (*i.e.*, suspending) certain users' accounts including, upon information and belief, Mr. Al-Ahmed's account.[19]

41.     Despite Asaker's alleged connections to both the Twitter spy campaign and murder of dissident journalists, Twitter CEO, Jack Dorsey ("Dorsey") met with both Asaker and MBS well after Dorsey learned about the KSA spy campaign; once at Twitter's headquarters on June 25, 2016, and at least one additional time in Riyadh thereafter.

42.     Notably, Dorsey follows Asakar's Twitter account (and vice versa) to this very day.

**D.  Mr. Al-Ahmed Did Not Learn About Twitter's Involvement Until November 2019.**

43.     On or about December 11, 2015, Twitter purportedly sent a notice (the "Twitter Notice") containing the following message to a "small group" of its users:

> Dear @{{screen_name}},
>
> As a precaution, we are alerting you that your Twitter account is one of a small group of accounts that may have been **targeted by state-sponsored actors**. We believe that **these actors (possibly associated with a government)** may have been trying to obtain information such as email addresses, IP addresses, and/or phone numbers.
>
> At this time, we have no evidence they obtained your account information, but we're actively investigating this matter. We wish we had more we could share, but we don't have any additional information we can provide at this time.
>
> It's possible your account may not have been an intended target of the suspected activity, but we wanted to alert you as soon as possible. We recognize that this may be of particular concern if you choose to Tweet using a pseudonym. For tips on protecting your identity online, you may want to visit the Tor Project or EFF's Protecting Yourself on Social Networks.

---

[19] https://www.justice.gov/usao-ndca/page/file/1299331/download

COMPLAINT AND DEMAND FOR JURY TRIAL
CASE NO.____

- Twitter

44.     Conspicuously absent from the Twitter Notice is any indication that these so-called "state-sponsored actors...possibly associated with a government" committed these data breaches while they were located on Twitter's premises and/or employed by Twitter and/or while using Twitter's resources and/or at the direction of Twitter (or with Twitter's tacit permission).

45.     This is critical, because at this time, Mr. Al-Ahmed *had no reason to know or believe* that Twitter was complicit in, or, at the very least, negligent in its hiring, training, supervision and/or retention of the conduct of its employees, Alzabarah and Abouammo. Had Mr. Al-Ahmed known that Twitter's employees were directly responsible for hacking his personal information, he would have taken swift and immediate action against Twitter and these employees; however, because Mr. Al-Ahmed did not, and *could not* have, known of Twitter's involvement (or the involvement of Alzabarah and Abouammo) until Alzabarah and Abouammo's public indictment on November 19, 2019, he did not take any action until this time.[20]

46.     The Twitter Notice does not exonerate Twitter, but rather the opposite. Indeed, insofar as Twitter deliberately omitted the fact that these so-called "state sponsored actors" were actually Twitter employees, Twitter was clearly trying to obfuscate its own malfeasance and complicity in the acts committed against Mr. Al-Ahmed including, but not limited to, breaching his account and accessing personal data and information without authorization, and subsequently providing this information to the KSA.

---

[20] https://www.justice.gov/usao-ndca/united-states-v-ahmad-abouammo

COMPLAINT AND DEMAND FOR JURY TRIAL
CASE NO.____

**E.  Plaintiff Suffered Actual Harm Directly Attributable To Twitter's Malfeasance**

47.     Upon information and belief, the United States Attorneys' Office has evidence that unequivocally proves Mr. Al-Ahmed's account was targeted and breached by Alzabarah and Abouammo while they were employed by Twitter and utilized Twitter's resources. Although Twitter attempts to portray these employees as "rogue" agents, there is evidence that Twitter was complicit in their conduct, or, at the very least, demonstrating that Twitter was negligent in protecting Mr. Al-Ahmed's personal information. At the very least, Twitter's failure to properly vet, supervise, and monitor Alzabarah and Abouammo (among others), as well as its failure to implement proper internal safeguards to prevent data breaches against its own users, resulted in the data breach and consequential damages against Mr. Al-Ahmed.  Upon information and belief, Twitter assisted the KSA in allowing Alzabarah and Abouammo to commit these breaches or, at the very least, operated with negligence  amounting to willful blindness.

48.     As a direct and consequential result of Twitter's conduct in being complicit in and/or negligent in allowing its employees to breach Mr. Al-Ahmed's account for over a year, Mr. Al-Ahmed lost significant revenue and earning potential related to his work as a journalist. Indeed, much of Mr. Al-Ahmed's work was contingent on his on-line presence, which was largely diminished as a result of Twitter's conduct, as well as his confidential sources, which were all but eviscerated as a result of Twitter's conduct.

49.     To this end, Mr. Al-Ahmed has a legally protected privacy interest in, *inter alia*, 1) the content of direct (non-public) communications of a personal, sensitive and, in certain instances, life or death nature he had with Twitter users inside the KSA and its surrounding areas; 2) the personal (non-public) information/identity of his Twitter contacts within the KSA

CASE NO.____

and its surrounding areas, many of whom were/are Plaintiff's confidential sources protected by, *inter alia*, California's Shield Law in Article I, Section 2(b) of the California constitution, the Free Flow of Information Act, D.C. Code §§ 16-4701, et seq.; 3) Plaintiff's own *non-public* personally identifying information including his *personal* address, email address and telephone number. Plaintiff reasonably expected the foregoing to be kept private because he never consented to Twitter's interception, theft, scanning, collection, storage, and dissemination of it for Twitter's own financial and nefarious benefit. Plaintiff never made his private information, including his personal phone number and email address publicly available. Yet, this information was compromised because of Twitter's conduct.

## CLAIMS FOR RELIEF

### CLAIM ONE
**Violations of the Electronics Communications Privacy Act ("EPCA")**
**(18 U.S.C. §§ 2511, *et seq.*)**
**(Against All Defendants)**

50.     Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

51.     The Electronic Communications Privacy Act, 18 U.S.C. §§ 2510, *et seq.* (the "ECPA") broadly defines an "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo optical system that affects interstate or foreign commerce. . . ." 18 U.S.C. § 2510(12).

52.     The ECPA defines "electronic communications system" as any wire, radio, electromagnetic, photo optical or photoelectronic facilities for the transmission of wire or electronic communications, and any computer facilities or related electronic equipment for the electronic storage of such communications. 18 U.S.C. § 2510(14).

COMPLAINT AND DEMAND FOR JURY TRIAL
CASE NO.____

53.     The ECPA broadly defines the contents of a communication. Pursuant to the ECPA, "contents" of a communication, when used with respect to any wire, oral, or electronic communications, include any information concerning the substance, purport, or meaning of that communication. 18 U.S.C. § 2510(8). The definition thus includes all aspects of the communication itself. The privacy of the communication to be protected is intended to be comprehensive.

54.     Plaintiff's personal computer and computer network constitutes an "electronic computer system." Plaintiff transmits "electronic communications" by and through his computers and computer network in the form of, among other things, Tweets, private messages, direct message, online chats, friend requests, file transfers, file uploads, and file downloads.

55.     Defendants' conduct violated 18 U.S.C. § 2511(1)(a) because they intentionally intercepted and endeavored to intercept Plaintiff's electronic communications to, from, and within their computers and computer networks.

56.     Defendants' conduct violated 18 U.S.C. § 2511(1)(d) because they used and endeavored to use the contents of Plaintiff's electronic communications to profit from their unauthorized collection and sale to the KSA, knowing and having reason to know that the information was obtained through interception in violation of 18 U.S.C. § 2511(1).

57.     Defendants intentionally obtained and/or intercepted, by device or otherwise, these electronic communications, without the knowledge, consent or authorization of Plaintiff.

58.     Plaintiff suffered harm as a result of Defendants' violations of the ECPA, and therefore seeks 1) preliminary, equitable and declaratory relief as may be appropriate; 2) the sum of the actual damages suffered and the profits obtained by Defendants as a result of their unlawful conduct, or statutory damages as authorized by 18 U.S.C. § 2520(2)(B), whichever is greater, 3) punitive damages; and 4) reasonable costs and attorneys' fees.

## CLAIM TWO
### Violations of the Computer Fraud and Abuse Act ("CFAA")
### (18 U.S.C. § 1030)
### (Against All Defendants)

59.     Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

60.     Defendants intentionally accessed a computer without authorization and/or exceeded any authorized access and in so doing intentionally breached Twitter's Terms of Service and Privacy Policy.

61.     Defendants illegally obtained this information from a protected computer involved in interstate or foreign communication.

62.     By scanning and removing information from local and network files, monitoring internet behavior, including keystroke logging consumer input, and injecting and extracting code and data onto and from Plaintiff's computer, Defendants accessed Plaintiff's computers, in the course of interstate commerce and/or communication, in excess of the authorization provided by Plaintiff as described in 18 U.S.C. § 1030(a)(2)(C).

63.     Defendants violated 18 U.S.C. § 1030(a)(2)(C) by intentionally accessing Plaintiff's and Class Members' computers and computer networks without authorization and/or by exceeding the scope of that authorization.

64.     Plaintiff's computer is protected computers pursuant to 18 U.S.C. § 1030(e)(2)(B) because it is used in interstate commerce and/or communication.

65.     By assessing, collecting, and transmitting Plaintiff's computer data without authorization, Defendants intentionally caused damage to his computer by impairing the integrity of information and/or data.

66.     Through the conduct described herein, Defendants have violated 18 U.S.C. § 1030(a)(5)(A)(iii).

67.     As a result, Defendants' conduct has caused a loss to Plaintiff in an amount exceeding $1,000,000 in value in real economic damages.

COMPLAINT AND DEMAND FOR JURY TRIAL
CASE NO.____

68.     Plaintiff expended time, money, and resources to investigate and remedy Defendants' breaches of his computer.

69.     Plaintiff has additionally suffered loss by reason of these violations, including, without limitation, violation of the right of privacy.

70.     Defendants' actions were knowing and/or reckless and caused harm to Plaintiff.

**CLAIM THREE**
**Violations of the Stored Communications Act**
**(18 USC §§ 2701, *et seq*.)**
**(Against All Defendants)**

71.     Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

72.     The Electronic Communications Privacy Act, 18 U.S.C. §§ 2510, et seq. (the "ECPA") broadly defines an "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo optical system that affects interstate or foreign commerce. . . ." 18 U.S.C. § 2510(12). The Stored Communications Act incorporates this definition.

73.     Pursuant to the ECPA and Stored Communications Act ("SCA"), "electronic storage" means any "temporary storage of a wire or electronic communication incidental to the electronic transmission thereof." 18 U.S.C. § 2510(17)(A). This type of electronic storage includes communications in intermediate electronic storage that have not yet been delivered to their intended recipient.

74.     The SCA mandates, among other things, that it is unlawful for a person to obtain access to stored communications on another's computer system without authorization. 18 U.S.C. § 2701.

75.     Congress expressly included provisions in the SCA to address this issue so as to prevent "unauthorized persons deliberately gaining access to, and sometimes tampering with,

electronic or wire communications that are not intended to be available to the public." S. Rep. No. 99–541, 35, 1986 U.S.C.C.A.N. 3555, 3589.

76.     Defendants have violated 18 U.S.C. § 2701(a)(1) because they intentionally accessed consumers-users' communications without authorization and obtained, altered and/or prevented authorized access to a wire or electronic communication while on Twitter's platform by blocking Plaintiff's access to Twitter's platform without justification and at the behest of the KSA. Defendants had actual knowledge of, and benefited from, this practice.

77.     Additionally, Defendants have violated 18 U.S.C. § 2701(a)(2) because they intentionally exceeded authorization to access consumers-users' communications and obtained, altered and/or or prevented authorized access to a wire or electronic communication while on Twitter's platform by blocking Plaintiff's access to Twitter's platform without justification and at the behest of the KSA. Defendants had actual knowledge of, and benefited from, this practice.

78.     Defendants have also violated 18 U.S.C. § 2701(a)(2) because they intentionally exceeded authorization to access consumers-users' communications and obtained, altered and/or prevented authorized access to a wire or electronic communication while in electronic storage by accessing files on the Plaintiff's network without permission.

79.     As a result of Defendants' conduct described herein and their violation of § 2701, Plaintiff has suffered injuries to his privacy rights, and economic harm due to Defendants' unjust enrichment at his expense. Plaintiff seeks an order enjoining Defendants' conduct described herein and awarding him the maximum statutory and punitive damages available under 18 U.S.C. § 2707.

**CLAIM FOUR**
**Violation of California's Unfair Competition Law ("UCL") California Business and Professions Code § 17200, et seq.**
**(Against Twitter)**

80.     Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

COMPLAINT AND DEMAND FOR JURY TRIAL
CASE NO.____

81.     The UCL defines "unfair business competition" to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. Prof. Code § 17200.

82.     The UCL imposes strict liability. Plaintiff need not prove that Twitter intentionally or negligently engaged in unlawful, unfair, or fraudulent business practices – but only that such practices occurred.

**I.      "Unfair" Prong**

83.     A business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications and motives of the practice against the gravity of the harm to the alleged victims.

84.     Twitter's actions constitute "unfair" business practices because, as alleged above, Twitter engaged in misleading and deceptive policies that represented false reference terms and correspondingly disparate/deleterious implementation, as well as aiding and abetting the unauthorized access of its consumers-users' accounts. The rules and policies Twitter posted and advertised lulled Plaintiff into a false sense of security but were nothing more than platitudes observed in the breach in order to preserve Middle East market access and appease a major shareholder. Similarly, Twitter's aiding and abetting of Alzabarah and Abouammo's conduct resulted in the unauthorized access to, and theft and dissemination of confidential/proprietary information from, its consumers-users' computers. Twitter's acts and practices offended an established public policy of transparency in policy making, as well as the established public policy of protecting private/confidential information, and engaged in immoral, unethical, oppressive, and unscrupulous activities that are substantially injuries to consumers-users.

85.     The harm to Plaintiff outweighs the utility of Twitter's practices. There were reasonably available alternatives to further Twitter's legitimate business interests other than the misleading and deceptive conduct described herein.

## II.     "Fraudulent" Prong

86.     A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

87.     Twitter's acts and practices above constitute fraudulent business acts or practices as they have deceived Plaintiff and are highly likely to deceive members of the consuming-user public. Plaintiff relied on Twitter's fraudulent and deceptive representations regarding its policies for services, and promise to protect private/confidential information, which Twitter offers on Twitter's website. These misrepresentations played substantial role in Plaintiff's decision to utilize Twitter's website and services to generate, support, and bolster his business, and Plaintiff would not have utilized Twitter's website and services without Twitter's misrepresentations.

## III.     "Unlawful" Prong

88.     A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

89.     Twitter's acts and practices alleged above constitute unlawful business acts or practices as they have violated state and federal law in connection with their deceptive policies in order to aid and abed in the unlawful access, theft, and dissemination of private/confidential information of its consumers-users. The Federal Trade Commission's Act ("FTCA") prohibits "unfair or deceptive acts or practices in or affecting commerce" (15 U.S.C. § 45(a)(1)), and the Electronics Communications Privacy Act of 1986 ("ECPA") (18 U.S.C. § 2511), which makes it unlawful to intercept, use and/or disclose—or assist in the intercepting, use, and/or disclosure of—the contents of electronic communications.

90.     Likewise, the Computer Fraud and Abuse Act ("CFAA") prohibits the transmission of information from and/or the unauthorized access of a "protected computer" resulting in damage or loss (18 U.S.C. §18 U.S.C. § 1030(a)(5)). The "term 'protected computer' means a computer— (B) which is used in or affecting interstate or foreign commerce or communication, including a computer located outside the United States that is

-23-

1   used in a manner that affects interstate or foreign commerce or communication of the United

2   States (§18 U.S.C. § 1030(e)(2))[21].

3       91.    In addition to federal law, California law also expressly prohibits knowingly and

4   without permission accessing, causing, and/or assisting in the accessing of a computer data

5   and computer system. *See* California Penal Code ("Cal. Penal Code") § 502. "In contrast to

6   the CFAA, the California statute does not require *unauthorized* access. It merely requires

7   *knowing* access." *United States v. Christensen*, 828 F.3d 763, 789 (9th Cir. 2016), *cert.*

8   *denied*, 137 S. Ct. 628 (2017) (emphasis in original) ("the term 'access' as defined in the

9   California statute includes logging into a database with a valid password and subsequently

10   taking, copying, or using the information in the database improperly."). In pertinent part, a

11   Computer Crime under Cal. Penal Code § 502 includes the following:

> (1) Knowingly accesses and without permission alters, damages, deletes, destroys, or otherwise uses any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data.
>
> (2) Knowingly accesses and without permission **takes, copies, or makes use of any data from a computer, computer system, or computer network**, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network.
>
> (3) Knowingly and without permission uses or causes to be used computer services.
> …
>
> (5) Knowingly and without permission disrupts or **causes the disruption of** computer services or denies or causes the denial of computer services to an authorized user of a computer, computer system, or computer network.
>
> (6) Knowingly and without permission provides or **assists in providing** a means of accessing a computer, computer system, or computer network in violation of this section.

---

[21] Similarly, the Antiterrorism Act of 1990 prohibits "harboring or concealing terrorists" (18 U.S.C. § 2339), "providing material support to terrorists" (18 U.S.C. § 2339A), "providing material support or resources to designated foreign terrorist" (18 U.S.C. § 2339B), and the "financing of terrorism" (18 U.S.C. § 2339C).

COMPLAINT AND DEMAND FOR JURY TRIAL

(7) Knowingly and without permission accesses or **causes to be accessed** any computer, computer system, or computer network.

Cal. Penal Code § 502(c)(1),(2),(3),(5), (6) and (7) (emphasis added).

92.     An individual or entity can be guilty of violating Cal. Penal Code § 502(c) by "assisting in providing means of accessing" and/or "caus[ing] to be accessed any computer, computer system, or computer network." *Id*.

93.     The violation of any law constitutes an "unlawful" business practice under the UCL.

94.     Twitter's practices and conduct, as set forth above, have misled Plaintiff and the public in the past and will continue to mislead in the future. Consequently, Twitter's practices constitute an unlawful, fraudulent, and unfair business practice within the meaning of the UCL.

95.     Twitter's violation of the UCL, through its unlawful, unfair, and fraudulent business practices, are ongoing and present a continuing threat that Plaintiff and the public will be deceived into utilizing their services that are subject to arbitrarily enforced policies and deliberately compromised private/confidential information of its consumers-users like Plaintiff.

96.      Pursuant to the UCL, Plaintiff is entitled to preliminary and permanent injunctive relief and order Twitter to cease this unfair competition, as well as disgorgement and restitution to Plaintiff and of all profits lost and Twitters' revenues associated with its unfair competition, or such portion of those lost profits and/or revenues as the Court may find equitable.

### CLAIM FIVE
**Unjust Enrichment**
**(Against Twitter)**

97.     Plaintiff hereby incorporates by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

98.     Upon all information and belief, Plaintiff conferred a monetary benefit upon Defendant Twitter. The same being achieved by use and sale of Plaintiff's personal data and exclusive content, including email addresses, contacts, phone numbers, and IP addresses of various followers of Plaintiff, all of which was obtained by the unlawful, or at the very least, unauthorized mining of Twitter's internal systems conducted by employees and/or agents of Defendant Twitter.

99.     Twitter appreciates or has knowledge of such benefit, as demonstrated by its public representations and filings regarding its consumers-users' online activity.

100.     Under principles of equity and good conscience, Twitter should not be permitted to retain the money obtained by selling information about Plaintiff to the KSA, which Twitter has unjustly obtained as a result of its unlawful actions.

101.     Accordingly, Mr. Al-Ahmed seeks full disgorgement and restitution of any money Twitter has retained as a result of the unlawful and/or wrongful conduct alleged herein.

**<u>CLAIM SIX</u>**
**Unjust Enrichment**
**(Against Alzabarah and Abouammo)**

102.     Plaintiff hereby incorporates by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

103.     Plaintiff conferred a monetary benefit on Alzabarah and Abouammo by virtue of his relationship with Twitter'S platform and their employment at Twitter. Upon information and belief, Alzabarah and Abouammo received and retained money, watches, and other consideration in exchange for selling data collected from Plaintiff through their data breaches

COMPLAINT AND DEMAND FOR JURY TRIAL
CASE NO.____

and improper surveillance of Plaintiff's account.[22] All of this information was collected from Plaintiff without authorization and through deceptive and unlawful conduct.

104.     Alzabarah and Abouammo appreciate or have knowledge of such benefits.

105.     Under principles of equity and good conscience, Alzabarah and Abouammo should not be permitted to retain the money and/or property obtained by selling information about Plaintiff to the KSA, which Alzabarah and Abouammo have unjustly obtained as a result of their unlawful actions.

106.     Accordingly, Plaintiff seeks full disgorgement and restitution of any money and/or property Alzabarah and Abouammo have retained as a result of the unlawful and/or wrongful conduct alleged herein.

**CLAIM SEVEN**
**Breach of Contract**
**(Against Twitter)**

107.     Plaintiff hereby incorporates by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

108.     In or about 2009, Plaintiff entered into a contractual relationship with Twitter when he created a Twitter user account.

109.     Both Plaintiff and Twitter agreed to abide by the terms of Twitter's User Agreement (the "Contract").

110.     Pursuant to Twitter's 2015 Terms, which, upon information and belief, mirror the terms that were in place during the relevant period, Twitter states, in pertinent part, that

> You may use the Services only if you can form a binding contract with Twitter and are not a person barred from receiving services under the laws of the United States or other applicable jurisdiction.

---

[22] https://www.justice.gov/usao-ndca/page/file/1299331/download

COMPLAINT AND DEMAND FOR JURY TRIAL
CASE NO.___

> If you are accepting these Terms and using the Services on behalf of a company, organization, government, or other legal entity, you represent and warrant that you are authorized to do so. You may use the Services only in compliance with these Terms and all applicable local, state, national, and international laws, rules and regulations.

111.    The foregoing language demonstrates the existence of a contractual relationship between Twitter and its users, including Plaintiff, and Twitter should be equitably estopped from asserting otherwise.

112.    While Twitter maintained the right to share or disclose certain personal data under limited conditions pursuant to its 2015 Privacy Policy, Twitter did not have the right to sell or share Plaintiff's private information to the KSA. In fact, in so doing, Twitter breached its policies by endangering Plaintiff's life, as well as the lives of his followers and confidential sources.

113.    In this regard, Twitter has agreed to take all necessary measures in order to properly and effectively safeguard Plaintiff's account.

114.    Plaintiff has abided by the terms set forth under the Contract between the parties, to the extent those obligations were not otherwise excused.

115.    Consideration for the Contract between the parties includes, without limitation, the mutual promises and covenants by Plaintiff and Twitter. Specifically, where Twitter granted a non-exclusive license to Plaintiff to access and use Twitter's platform conditioned on compliance with all applicable terms, laws, rules, and regulations, in exchange for Twitter, its third-party providers, and partners to retain discretionary authority to advertise in connection with the display of Plaintiff's exclusive content. The pertinent language is as follows:

> In consideration for Twitter granting you access to and use of the Services, you agree that Twitter and its third party providers and partners may place such advertising on the Services or in connection with the display of Content or information from the Services whether submitted by you or others.

116.    In breach of the Contract, in or around 2014 through and including 2018, Twitter, without any legitimate justification, breached the Contract by failing to adhere to the procedures and protections set forth in Twitter's policies in ways including, but not limited to, the following:

    a.  Selling and/or providing Plaintiff's personal user data, private information, proprietary information, contact information, and other account and personal information to the KSA.

    b.  Facilitating the sale or providing of Plaintiff's personal user data, private information, proprietary information, contact information, and other account and personal information to the KSA.

    c.  Failing to ensure that all necessary measures were being taken in order to properly and effectively safeguard Plaintiff's account and personal information;

    d.  Failing to follow its own internal rules, policies, and procedures;

    e.  Deliberately disclosing and/or assisting in the disclosure of Plaintiff's sensitive, confidential, and proprietary information to the KSA in violation of its own internal policies, federal and California law;

    f.  Allowing its employees to access and tamper with, access and share information from, send out fraudulent, fictitious, or false messages to other users from, and otherwise sabotage Plaintiff's Twitter account;

    g.  Suspending Plaintiff's Twitter account without adequate justification;

    h.  Preventing Plaintiff from continuing to use or accessing his Twitter account; and

i.   Failing to adequately or meaningfully address and consider Plaintiff's appeal from the suspension of his account.

117.   Plaintiff has suffered damages as a direct and proximate result of Twitter's breach of the user agreement and Twitter's policies including, but not limited to, the following.

a.   Long-term injury and damage to his professional reputation and career

b.   Loss of compensation, wages, and income

c.   Loss of employment and freelance opportunities, interviews, and events at other institutions; and

d.   Emotional pain and suffering.

118.   As a direct and legal result of Twitter's breach of the Contract, Plaintiff has been damaged in an amount to be determined at trial, but which is in excess of $75,000.

**CLAIM EIGHT**
**Promissory Estoppel**
**(Against Defendant Twitter)**

119.   Plaintiff hereby incorporates by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

120.   Twitter, by express assertions and its conduct, promised through their "Privacy Policy" that only non-personal data, such as aggregated information referring to engagements, posts, and demographics would be shared or disclosed. Furthermore, through Twitter's "Privacy Policy", when referring to "Direct Messages and Non-Public Communications," Twitter asserted that users' personal data would be stored and processed for the purpose of, *inter alia*, "to protect the safety and integrity of Twitter's platform." Additionally, through its "Twitter Rules", Twitter promised their commitment to "serve the public conversation" and to vehemently oppose violent and terrorist-like activity.

-30-

121.   Plaintiff reasonably relied on Twitter's aforesaid assertions and promises to his injury and detriment, in that Plaintiff would engage in conversations via Twitter's "Direct Messaging" feature with many pro-democracy confidants, the substance of those communications being personal and sensitive in nature, and in many instances, of life and death consequence.

122.   Based on Twitter's "Rules" and "Privacy Policy", which contained the above assertions, Twitter knew or should have known that Plaintiff would rely on its promises and conduct, and that the same would induce Plaintiff to reasonably believe that the identities to and the substances of these communications would be obtained and/or mined by KSA spies to harm and silence KSA critics.

123.   Twitter has reneged on its promise so as to violate the binding Agreement between Twitter and Plaintiff, as well as breached the assertions referenced above, both expressly and by its conduct.

124.   The aforementioned wrongful acts of Twitter caused and are continuing to cause irreparable injury to Plaintiff and will continue to cause damage to Plaintiff in an amount in excess of the jurisdictional limits of this Court.

### CLAIM NINE
**Intrusion Upon Seclusion**
**(Against All Defendants)**

125.   Plaintiff hereby incorporates by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

126.   Section 3.3 of Twitter's 2015 Privacy Policy, which, upon information and belief, mirror the terms that were in place during the relevant period, states, in pertinent part, that

> Notwithstanding anything to the contrary in this Privacy Policy or
> controls we may otherwise offer to you, we may preserve, use, share,
> or disclose your personal data or other safety data if we believe that

-31-

it is **reasonably necessary to comply with a law, regulation, legal process, or governmental request**: to protect the safety of any person; to protect the safety or integrity of our platform, including to help prevent spam, abuse, or malicious actors on our services, or to explain why we have removed content or accounts from our services; to address fraud, security, or technical issues; or to protect our rights or property or the rights or property of those who use our services. However, nothing in this Privacy Policy is intended to limit any legal defenses or objections that you may have to a third party's, including a government's, request to disclose your personal data.

127.    Thus, while Twitter retained the right to share or disclose certain personal data under limited conditions, Twitter did not have the right to sell or share Plaintiff's private information to the KSA, and doing so was a breach of its very policies. Indeed, even without an expression provision, selling or transferring such information to a foreign state actor known to severely sanction critics would be a violation of good faith which is part and parcel of this agreement.

128.    Pursuant to Twitter's 2015 Terms, Plaintiff had a reasonable expectation that his personal data, including contacts, private messages, confidential sources, and other proprietary information contained within his Twitter account would be protected against unlawful access, breach, and dissemination.

129.    Defendants, without authorization, intentionally invaded Plaintiff's private affairs by unlawfully, and in contravention of Twitter's policies, rules, and regulations, breached Plaintiff's account, gained access to his personal, confidential, and proprietary data and information including, but not limited to, private messages, contacts, confidential sources, conversations, and information, and provided the foregoing to the KSA.

130.    The aforementioned invasion of Plaintiff's affairs is offensive to a reasonable person insofar as it involved private and confidential communications between Plaintiff and

CASE NO.____

his journalistic sources, many of whom put their lives at risk to offer information, and some of whom were imprisoned or simply disappeared as a result of Defendants' unlawful spying.

131.    As of result of the foregoing, Plaintiff has suffered and continues to suffer severe mental anguish and suffering, and pecuniary harm.

**COUNT TEN**
**Negligent Hiring, Supervision, and Retention**
**(Against Twitter)**

132.    Plaintiff hereby incorporates by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

133.    Twitter knew, or should have known, that Alzabarah and Abouammo were unfit, incompetent, and/or otherwise too compromised to perform their job duties and therefore posed a risk to Twitter users including, but not limited to, Plaintiff, because of Alzabarah and Abouammo's allegiance and loyalty to, and close relationship with, the KSA and its associates, as well as their obvious propensities to engage in the conduct that caused injuries to Plaintiff as described herein. Upon information and belief, had Twitter performed an appropriate background and screening test, it would have revealed that Alzabarah and Abouammo had troubling and suspicious relationships with key members of the KSA including, but not limited to, Asaker, MBS's top aide and the ultimate mastermind behind the Twitter spying scandal.

134.    The conduct engaged in by Alzabarah and Abouammo, as alleged herein, was avoidable and would not have occurred had Twitter implemented and exercised appropriate hiring and screening practices.

135.    Twitter failed to exercise reasonable care, and failed to implement policies, practices, and both procedural and oversight safeguards that could have, and would have, prevented the acts perpetrated by Alzabarah and Abouammo. The conduct engaged in by Alzabarah and Abouammo, as alleged herein, was avoidable and would not have occurred had

Twitter implemented and exercised appropriate supervisory and oversight practices over its employees. This further demonstrated by the fact that, at least as asserted by Twitter, it took them at least one year to even detect the improper and criminal actions of Alzabarah and Abouammo.

136.    Twitter had advanced knowledge that Alzabarah and Abouammo were causing harm to Twitter users, including Plaintiff, and that a failure to remedy or mitigate the problem would result in a catastrophic event, which foreseeably would lead to harm and/or injuries to Twitter users including Plaintiff. Twitter had complete control over the hiring, supervision, and retention of Alzabarah and Abouammo, but failed to implement the appropriate mechanism to adequately supervise these individuals. The wrongful acts and/or omissions of Twitter, as set forth herein, were made, adopted, approved, authorized, endorsed and/or ratified by Twitter, its officers, directors, managing agents and/or employees, and were done maliciously, oppressively, fraudulently and/or with a willful and knowing disregard of the probable consequences for the safety and privacy of Plaintiff and the Twitter community at large.

137.    Twitter acted with malice, oppression and/or fraud in a manner that is shocking and offensive, thereby entitling Plaintiff to an award of punitive damages in an amount to be determined at trial.

**COUNT ELEVEN**
**CIVIL CONSPIRACY**
**(Against All Defendants)**

138.    Plaintiff hereby incorporates by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

139.    At all times hereinafter mentioned, Defendants, each and every one of them, agreed and/or combined to engage in a civil conspiracy by formulating and operating an

employment relationship for the conscious commitment to allow the individual Defendants, acting through purposeful acts of espionage, to improperly acquire and gain access to Plaintiff's private information for the sole purpose of silencing and injuring Plaintiff and/or others who had direct contact with him through the use of Defendant Twitter's public and private platform features. This commitment to silence and injure Plaintiff and his followers was accomplished not only by the individual acts of Defendants Alzabarah and Abouammo, but by Defendant Twitter aiding and abetting the conspiracy by effectively suspending, banning, and otherwise rendering Plaintiff's public account inaccessible.

140.   At all times hereinafter mentioned and upon all information and belief, Defendants, each and every one of them, agreed and/or combined to engage in a conspiracy to commit the unlawful acts described above.

141.   At all times hereinafter mentioned and upon all information and belief, Defendants, each and every one of them, agreed and/or combined to engage in a conspiracy of which the principal element was to inflict wrongs against and/or injury on Plaintiff.

142.   At all times hereinafter mentioned and upon all information and belief, Defendants, each and every one of them, combined to engage in a conspiracy that was furthered by over acts.

143.   At all times hereinafter mentioned, Defendants, each and every one of them, acquired, possessed, and maintained a general knowledge of the conspiracy's objectives to inflict wrongs against and/or injury on Plaintiff as described above.

144.   Upon all information and belief, Defendants, each and every one of them, combined to engage in a scheme that was intended to violate the law and the rights of Plaintiff and the public-at-large.

145.    In committing the acts described above, Plaintiff suffered actual damages, including emotional distress, mental suffering, and significant injuries to his personal and professional reputations.

146.    In committing the acts described above, Defendants acted with malice toward Plaintiff, and therefore is entitled to recover in such amount as will sufficiently punish Defendants, jointly and severally, for their willful and malicious conduct and as will serve as an example to prevent a repetition of such conduct in the future.

**COUNT TWELVE**
**NEGLIGENCE**
**(Against Twitter)**

147.    Plaintiff hereby incorporates by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

148.    At all times hereinafter mentioned, Defendants Alzabarah and Abouammo were employed by Defendant Twitter.

149.    At all times hereinafter mentioned, Defendants Alzabarah and Abouammo were agents, servants and/or employees of Defendant Twitter.

150.    At all times hereinafter mentioned, Defendants Alzabarah and Abouammo were acting within the course and scope of their employment with Defendant Twitter.

151.    At all times hereinafter mentioned, Defendants Twitter was and is liable for the acts of Defendants Alzabarah and Abouammo under the doctrine of *respondeat superior*.

152.    At all times hereinafter mentioned, Defendant Twitter maintained control over its internal policies, practices, and safeguards for securing its internal database, users' personal and private data.

153.    At all times hereinafter mentioned, Defendant Twitter maintained control over the acts and duties of employees/Defendants Alzabarah and Abouammo.

-36-

COMPLAINT AND DEMAND FOR JURY TRIAL

CASE NO.___

154.    At all times hereinafter mentioned, upon information and belief, Defendant Twitter negligently and/or recklessly failed to implement policies, practices, and both procedural and oversight safeguards that could have, and would have, prevented the acts perpetrated by Alzabarah and Abouammo as described herein.

155.    At all times hereinafter mentioned, Defendant Twitter failed to use reasonable care in its supervision and monitoring of Alzabarah and Abouammo.

156.    At all times hereinafter mentioned, upon information and belief, Defendant Twitter negligently and/or recklessly authorized Defendants to possess and use unfettered access to Twitter's internal database and users' personal and private data for the purpose of unlawfully obtaining Plaintiff's private information.

157.    At all times hereinafter mentioned, Defendant Twitter, as a private operator of a public platform, has a legal duty to use reasonable and due care in operating, managing, and providing safeguards for securing its internal database, so as not to injure Plaintiff.

158.    As a direct and proximate result of Defendant Twitter's recklessness and negligence, Plaintiff was caused to suffer actual damages, including emotional distress, mental suffering, and injury to his personal and professional reputations, without any negligence on the part of Plaintiff contributing thereto.

**COUNT THIRTEEN**
**REPLEVIN-CLAIM AND DELIVERY**
**(Against Twitter)**

159.    Plaintiff hereby incorporates by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

160.    Plaintiff has a rightful property interest and right to possession in and use of any and all information related to subscribers to his Twitter posts who followed his posting and pronouncements and editorials on matters of common interest.

COMPLAINT AND DEMAND FOR JURY TRIAL
CASE NO.____

161.    Plaintiff spent many years of time and effort cultivating and curating his expansive list of Twitter followers and business contacts which totaled approximately 36,000 at the time in which Defendants abruptly and wrongfully withheld access.

162.    Plaintiff's approximately 36,000 subscribers lists with associated data constitute a valuable intellectual and proprietary property—particularly insofar as it has earned Plaintiff credibility, career nods and income correlated to this huge universe of persons interested in unvarnished coverage of the KSA's activities provided from a pro-democracy and pro-human rights vantage point.

163.    Defendants individually and collectively have wrongfully withheld from Plaintiff access to his 36,000 followers/subscribers lists while upon information and belief using or misusing, selling or transferring or simply shelving this data.

164.    Upon information and belief Defendants have for far too long operated in the dark, accountable to no one, saying one thing while doing another without an iota of transparency while donning a mantle of integrity and faux objectivity while converting amassed data to their own pecuniary purposes.

165.    Under principles of equity and good conscience Defendants should not be permitted to retain these lists or restrict or withhold access to this list of approximately 36,000 patrons of Plaintiff's journalistic and humanitarian coverage which Defendants have wrongfully withheld as a result of their unlawful actions and/or post-hoc rationalization sanctions.

166.    Upon information and belief this list is segregated and tagged 'so to speak' and therefore easily identifiable within Defendant Twitter's systems and can therefore with the proverbial flipping of a switch Plaintiff's access to said data restorable with immediacy.

167.    Accordingly, Plaintiff seeks full disgorgement and/or restoration of access to or transfer of this list of 36,000 subscribers retained by Defendant Twitter  as a result of the unlawful and/or wrongful conduct alleged herein.

**<u>PRAYER FOR RELIEF</u>**

1.   Compensatory damages for all economic loss and psychological injuries including, but not limited to, loss of past or future profit, revenue, and income, to the extent allowed by law and in an amount to be determined at trial.

2.   Punitive or exemplary damages, in an amount sufficient to punish Defendants and to deter future similar misconduct, to the extent allowed by law.

3.   Injunctive and prospective relief as the Court may order to prevent further wrongful acts, to the extent allowed by law.

4.   The costs of litigations including reasonable attorneys' fees, to the extent allowed by law.

5.   Any other damages permitted to be recovered by law pursuant to the above causes of action.

DATED:  October 1, 2021                RESPECTFULLY SUBMITTED

**GERSTMAN SCHWARTZ, LLP**
By:  */s/ Randy E. Kleinman*
Randy E. Kleinman, Esq. (CA SBN 320061)
1399 Franklin Avenue, Suite 200
Garden City, New York 11530
Tel. No.: (516) 880 – 8170
rkleinman@GerstmanSchwartz.com
*Attorneys for Plaintiffs*